UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:11-CV-192-BR

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| $2,599.00 IN U.S. CURRENCY, | ) | |
| $8,000.00 IN U.S. CURRENCY, | ) | |
| $691,814.00 IN U.S. CURRENCY, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the 7 November 2012 motion for summary judgment

filed by plaintiff United States of America ("the government"). (DE # 28.) The motion has been

fully briefed and is ripe for disposition.

## I. BACKGROUND

This is a civil action *in rem* in which the government seeks the forfeiture of three separate

but related seizures of United States currency totaling $702,413.00. The government contends

that the defendant currency[1] is the proceeds of illegal drug transactions. See 21 U.S.C. §

881(a)(6).

The undisputed facts in this case are as follows: On 15 March 2011, at approximately

1:10 a.m., patrol officers with the New Hanover County Sheriff's Office ("NHCSO") went to

4504 Tesla Park Drive, Apartment 206, in Wilmington, North Carolina ("the apartment") in

---

[1] "Civil forfeiture actions are brought against property, not people. . . . Because civil forfeiture is an *in rem* proceeding, the property subject to forfeiture is the defendant. Thus defenses against the forfeiture can be brought only by third parties, who must intervene." United States v. 8 Gilcrease Lane, Quincy Fla. 32351, 641 F. Supp. 2d 1, 4 (D.D.C. 2009) (citations and internal quotation marks omitted).

response to a call regarding a sudden death. (J.D. Williams Decl., DE # 29-3, ¶ 4; W. Baxley Decl., DE # 29-4, ¶ 4.) When the officers arrived on the scene, Leah Jakeway ("Jakeway") led them to the body of her boyfriend, Jonathan Ryan MacDonald ("MacDonald"). (J.D. Williams Decl., DE # 29-3, ¶ 8; W. Baxley Decl., DE # 29-4, ¶ 5.) MacDonald was found lying on his back on the bedroom floor, with blood coming out of his nose and white residue around his lips. (J.D. Williams Decl., DE # 29-3, ¶ 7; W. Baxley Decl., DE # 29-4, ¶ 6.) Jakeway informed the officers that she and MacDonald used cocaine two or three times a day and that they had snorted some cocaine at approximately 8:00 a.m. the previous morning. (J.D. Williams Decl., DE # 29-3, ¶ 9.) Jakeway stated that she took a shower afterward and when she finished, MacDonald was asleep in bed. (E. Savitts Decl., DE # 29-2, at 4.) It was over sixteen hours later that she found MacDonald to be unresponsive. (Id.) Officers on the scene determined that MacDonald was deceased.[2] (Id.)

During the initial investigation, Jakeway told officers that MacDonald carried a couple thousand dollars in his wallet and that she was concerned that they may have been robbed as they slept. (E. Savitts Decl., DE # 29-2, at 4-5; J.D. Williams Decl., DE # 29-3, ¶¶ 10, 14; S.W. Holbrook Decl., DE # 29-6, ¶ 13.) The officers were also unable to locate photo identification for MacDonald in the residence. (E. Savitts Decl., DE # 29-2, at 4; J.D. Williams Decl., DE # 29-3, ¶ 14; S.W. Holbrook Decl., DE # 29-6, ¶ 13.) Based on the absence of photo identification for MacDonald and on the possible theft of money, officers requested consent to search the apartment, which Jakeway provided. (E. Savitts Decl., DE # 29-2, at 5; J.D. Williams Decl., DE # 29-3, ¶¶ 11, 14; S.W. Holbrook Decl, DE # 29-6, ¶ 12.) The search revealed five cellular

_____

[2] The cause of death was later determined to be cocaine toxicity. (J.D. Williams Decl., DE # 29-3, ¶ 21.)

2

phones in the kitchen; a rolled up $5 bill containing white powder residue; a straw and flyer in the kitchen containing white powder residue; suspicious white powder on a cutting board in the kitchen; two glass smoking pipes; and confirmed cocaine residue on the master bathroom counter top. (J.D. Williams Decl., DE # 29-3, ¶ 12; W. Baxley Decl., DE # 29-4, ¶ 7.)

Jakeway further informed the officers that there was a safe in the apartment and that MacDonald's wallet might be in it, but she did not know where the safe was located. (J.D. Williams Dep., DE # 29-5, at 72:19-73:2; 75:21-76:4.) The locked safe was eventually found in the bedroom closet. (J.D. Williams Decl., DE # 29-3, ¶ 14.) Jakeway gave the officers permission to open the safe in order to search for MacDonald's photo identification. (Id.) Because Jakeway did not know where the key was, the officers pried the safe open. (Id.; J.D. Williams Dep., DE # 29-5, at 74:9-12; 76:18-21; S.W. Holbrook Decl., DE # 29-6, ¶ 14.) Inside the safe, officers found a clear plastic bag containing twenty-five grams of cocaine, eight dosage units of Oxycodone, a cell phone, MacDonald's wallet, and keys to an Audi automobile, which Jakeway told them was the car that MacDonald drove and that it was parked nearby. (E. Savitts Decl., DE # 29-2, at 5; J.D. Williams Decl., DE # 29-3, ¶¶ 15, 17; S.W. Holbrook Decl., DE # 29-6, ¶¶ 14-15.) The wallet contained $2,599.00 but did not contain any photo identification. (J.D. Williams Decl., DE # 29-3, ¶ 16; S.W. Holbrook Decl., DE # 29-6, ¶ 14.)

Officers proceeded to search the Audi in a continued effort to locate MacDonald's photo identification. (J.D. Williams Decl., DE # 29-3, ¶ 17; J.D. Williams Dep., DE # 29-5, at 92:4-15.) Although no identification was found, officers did discover a suitcase in the trunk, which they proceeded to open. (J.D. Williams Decl., DE # 29-3, ¶ 18.) In the suitcase, the officers found what they thought was a large amount of currency. (Id.) They arranged for a

3

canine sniff of the Audi, and then they sought and obtained a search warrant for the vehicle. (Id. ¶ 19; E. Savitts Decl., DE # 29-2, at 6; W. Baxley Decl., DE # 29-4, ¶¶ 11-14; A. Morrissette Decl., DE # 29-7, ¶¶ 6-9, 17.) A second canine sniff of the Audi was conducted after the car was towed to the NHCSO's secure garage. (E. Savitts Decl., DE # 29-2, at 6; C.H. Carey Decl., DE # 29-8, ¶¶ 3-14.) The suitcase contained thirteen bundles of vacuum-sealed currency totaling $691,814.00.[3] (E. Savitts Decl., DE # 29-2, at 6-7; A. Morrissette Decl., DE # 29-7, ¶¶ 32, 34; C.H. Carey Decl., DE # 29-8, ¶ 15.)

Meanwhile, it had been determined that the Audi was registered to Rebecca Lalone ("Lalone") who lived in Wilmington, North Carolina. (A. Morrissette Decl., DE # 29-7, ¶ 10.) Officers contacted Lalone, and she identified herself as MacDonald's stepmother. (Id. ¶¶ 11-12.) Lalone stated that although she had registered the vehicle in her name, MacDonald had paid for the Audi in cash just a few weeks earlier. (Id. ¶ 13.) Lalone claimed that she had never driven the vehicle and that only MacDonald drove it. (Id. ¶ 14.) Lalone declared that she had no property inside the vehicle. (Id. ¶ 15.) Lalone also stated that MacDonald had been residing at her house in Wilmington, North Carolina, for the prior six to seven weeks.[4] (Id. ¶ 16.)

Officers later met Lalone at her home. (Id. ¶ 19.) They searched her residence on the authority of a search warrant that was issued based on information developed from the investigation at the apartment and the search of the Audi. (Id. ¶¶ 17-19.) The search of the

---

[3] Eleven of the thirteen bundles were also wrapped in magnetic tape and double wrapped in black duct tape. (E. Savitts Decl., DE # 29-2, at 7; A. Morrissette Decl., DE # 29-7, ¶ 32.)

[4] When MacDonald's body was found at the apartment, he appeared to only have one pair of shoes, one pair of socks, one pair of pants, a few t-shirts, and two button-down shirts in the residence. These items suggested that MacDonald's stay at the apartment was transient. (E. Savitts Decl., DE # 29-2, at 5; J.D. Williams Decl., DE # 29-3, ¶ 13.)

4

home uncovered $8,000.00 inside Lalone's bedroom closet.  (Id. ¶ 21; J. Hart Decl., DE # 31-9, ¶¶ 10-15.)  Lalone stated that she did not know anything about the money.  (J. Hart Decl., DE # 31-9, ¶ 12.)  In the bedroom formerly occupied by MacDonald, officers also located approximately seven grams of powder cocaine, a digital scale, fifty-four dosage units of Valium, a bank card, and a ledger documenting large currency amounts.  (E. Savitts Decl., DE # 29-2, at 8-9; A. Morrissette Decl., DE # 29-7, ¶¶ 20, 24.)

A search of Lalone's garage produced a fire safe containing a plastic bag with cocaine residue as well as packaging material and a box containing unused vacuum sealer bags.  (Id. ¶¶ 23, 25; E. Savitts Decl., DE # 29-2, at 8-9; J. Hart Decl., DE # 31-9, ¶ 16.)  The vacuum sealer bags were consistent with those seized from the Audi.  (E. Savitts Decl., DE # 29-2, at 9.)  Officers also searched a garbage container in the driveway of the residence, from which they collected used vacuum sealer bags and an empty pill bottle.  (Id.; A. Morrissette Decl., DE # 29-7, ¶ 26.)  Some of the vacuum sealer bags had large denomination markings (e.g., "12K," indicating $12,000) and contained fabric softener sheets.  (E. Savitts Decl., DE # 29-2, at 9; A. Morrissette Decl., DE # 29-7, ¶ 26.)

The government filed this forfeiture action on 14 September 2011.  (DE # 1.)  On 3 October 2011, claims were filed by three claimants: Karen Pedersen-MacDonald ("Pedersen-MacDonald"), Lis Johansen ("Johansen") and Lalone (collectively "claimants").  (DE ## 6-8.)  Claimants filed a joint answer to the complaint on 20 October 2011.  (DE # 10.)  Both Pedersen-MacDonald and Johansen claim all of the defendant currency (DE ## 6, 8), while Lalone claims only the $8,000.00 seized from her home (DE # 7).  In their claims, Pedersen-MacDonald and Johansen assert that they are heirs of MacDonald, the former as his

5

spouse and the latter as guardian for his minor child.  (DE ## 6, 8.)  Lalone maintains that the

$8,000.00 seized from her home was a gift to her from her stepson MacDonald.  (R. Lalone

Dep., DE # 30-1, at 37:6-38:22; 46:6-13.)

On 7 November 2012, the government filed a motion for summary judgment.  (DE # 28.)

Claimants filed a joint response to the motion on 14 December 2012 (DE # 36), and the

government filed a reply on 14 January 2013 (DE # 38).

## II.  DISCUSSION

A.    Fourth Amendment Challenge

Claimants contend that the search of the safe found at the apartment was "an

unconstitutional violation of the Fourth Amendment" because Jakeway "did not have authority

to consent to the breaking open of the locked safe, to which she did not have a key."  (Claimants'

Mem. Opp'n Mot. Summ. J., DE # 36, at 5.)  As a result, claimants argue that the evidence found

in the safe must be suppressed.  They further argue that the evidence obtained from the search of

the Audi and the search of Lalone's residence must also be suppressed as the fruit of the

allegedly illegal search of the safe.  Claimants maintain that the government cannot meet its

burden on summary judgment without the evidence derived from these searches.

In response, the government argues that none of the claimants have "standing"[5] to contest

the search of the safe.  The Fourth Amendment to the United States Constitution protects citizens

_____

[5] The United States Supreme Court has suggested moving away from analyzing an individual's Fourth Amendment interest as a separate issue of standing.  See United States v. Paradis, 351 F.3d 21, 27 (1st Cir. 2003).  As the Supreme Court explained in Minnesota v. Carter, 525 U.S. 83 (1998), the "'definition of [Fourth Amendment] rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'"  Id. at 88 (quoting Rakas v. Illinois, 439 U.S. 128, 140 (1978)).  Thus, the court uses the term "standing" as "shorthand for the determination of whether a litigant's Fourth Amendment rights have been implicated."  United States v. Stearn, 597 F.3d 540, 551 (3d Cir. 2010) (citation and internal quotation marks omitted).

6

against unreasonable searches and seizures.  U.S. Const. amend. IV.  Evidence seized during an unreasonable search may be suppressed under the exclusionary rule.[6]  See, e.g., Davis v. United States, 131 S. Ct. 2419, 2423 (2011) (the exclusionary rule is "a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation"); United States v. Banks, 482 F.3d 733, 738 (4th Cir. 2007).  However, one may not litigate an alleged Fourth Amendment violation unless one is personally aggrieved.  Fourth Amendment rights are personal rights that may not be asserted vicariously.  See Rakas v. Illinois, 439 U.S. 128, 133-34 (1978); United States v. Bullard, 645 F.3d 237, 242 (4th Cir.), cert. denied, 132 S. Ct. 356 (2011).  Accordingly, the burden is on each claimant in this case to show that she has standing to assert a Fourth Amendment violation.  See Rakas, 439 U.S. at 130 n.1; United States v. $1,790,021 in U.S. Currency, 261 F. Supp. 2d 310, 314 (M.D. Pa. 2003).  Each claimant bears the burden of establishing the existence of a protected Fourth Amendment interest by a preponderance of the evidence.  See United States v. Vega, 221 F.3d 789, 795 (5th Cir. 2000); United States v. Gardner, No. 5:11-CR-228-FL, 2013 WL 361063, at *1 (E.D.N.C. Jan. 30, 2013).

The capacity to claim the protection of the Fourth Amendment depends upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the area searched.  See Bullard, 645 F.3d at 242; United States v. Bynum, 604 F.3d 161, 164 (4th Cir. 2010).  Largely adopting the approach taken by Justice Harlan in his concurring opinion in

---

[6] The Fourth Amendment exclusionary rule applies in civil forfeiture cases.  See, e.g., One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 702 (1965); United States v. $493,850.00 in U.S. Currency, 518 F.3d 1159, 1164 (9th Cir. 2008); United States v. $7,850.00 in U.S. Currency, 7 F.3d 1355, 1357 (8th Cir. 1993) ("Because forfeiture proceedings are quasi-criminal in character, the exclusionary rule applies barring evidence obtained in violation of the Fourth Amendment."); Vance v. United States, 676 F.2d 183, 188 (5th Cir. 1982).  Therefore, a forfeiture cannot rest on tainted evidence.  See, e.g., $7,850.00 in U.S. Currency, 7 F.3d at 1357; Vance, 676 F.2d at 188.

Katz v. United States, 389 U.S. 347, 361 (1967), the United States Supreme Court has stated that this inquiry normally embraces two distinct questions:

> The first is whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy . . . – whether . . . the individual has shown that he seeks to preserve [something] as private. . . . The second question is whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable . . . – whether . . . the individual's expectation, viewed objectively, is justifiable under the circumstances.

Smith v. Maryland, 442 U.S. 735, 740 (1979) (some alterations in original) (citations and internal quotation marks omitted); see also Doe v. Broderick, 225 F.3d 440, 450 (4th Cir. 2000).


In this case, it is clear that none of the claimants had a subjective expectation of privacy in the safe. Claimants make no argument or suggestion that any of them were present during the search of the safe or were aware of the search. Moreover, at the time the search was conducted, none of them had any knowledge whatsoever of the existence of the safe or its contents. There is simply no indication in the record that any of the claimants personally sought to preserve the particular location searched, and its contents, as private.

Claimants do not appear to deny that they lacked a subjective expectation of privacy in the safe. Instead, they argue that the recent decision of the United States Supreme Court in United States v. Jones, 132 S. Ct. 945 (2012), provides them with a basis for establishing standing. In that case, the court held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" for Fourth Amendment purposes. Id. at 949 (footnote omitted). The five-justice majority found that a search occurred because "[t]he Government physically occupied private property for the purpose of obtaining information." Id. The majority opinion emphasized that

8

the government had committed a common-law trespass by installing the tracker on the vehicle.

Id. at 949-50.

The only argument made by claimants with respect to the holding in Jones is as follows:

> As heirs to Mr. MacDonald's personal property, which included the safe, Ms. Johansen, in her capacity of guardian for Mr. MacDonald's minor child, and Ms. Pedersen-MacDonald, as Mr. MacDonald's surviving spouse, both had a property interest in the Sentry safe . . . . Since they had property interests in the safe, their personal property interests were trespassed, and they have standing to bring the Fourth Amendment challenge.

(Claimants' Mem. Opp'n Mot. Summ. J., DE # 36, at 5.)[7]

However, in Jones, the Supreme Court "expressly declined to consider whether Jones had standing to challenge the installation of the device on the car for which he was 'the exclusive driver,' but that was registered in his wife's name." United States v. Gibson, 708 F.3d 1256, 1276 (11th Cir. 2013) (quoting Jones, 132 S. Ct. at 949 n.2); see also United States v. Sparks, 711 F.3d 58, 62 n.1 (1st Cir. 2013) (noting without deciding that temporary passenger of vehicle appeared to lack the requisite interest to give him standing to challenge the search of the vehicle under Jones).  Moreover, unlike claimants' situation in this case, Justice Scalia emphasized that Jones "possessed the Jeep at the time the Government trespassorily inserted the information-gathering device . . . ." Jones, 132 S. Ct. at 952.  He further stressed that "[a]t bottom, we must 'assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.'"  Id. at 950 (second alteration in original) (quoting Kyllo v. United States, 533 U.S. 27, 34 (2001)).  Thus, while it is evident that Jones has reinvigorated the theory of trespass as a means to assert Fourth Amendment challenges, it did not

---

[7] The court notes that Lalone does not appear to claim any property interest in the safe.  Because she had no legitimate expectation of privacy in the safe and also had no property interest in it, she cannot establish any protected Fourth Amendment interest that would give her a basis for challenging the search of the safe.

9

negate the long-held principle that an individual must show some subjective expectation of privacy in order to have a basis for challenging a search. See, e.g., Minnesota v. Carter, 525 U.S. 83, 88 (1998) ("[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched . . . ."). As a result, the trespass theory underlying Jones is not helpful to claimants for the purpose of establishing standing.

Furthermore, even if the court assumes *arguendo* that the decision in Jones could provide assistance to claimants, their alleged property rights in this case are too attenuated to establish standing. None of the claimants had physical custody or control of the safe at the time it was searched. It is also apparent from the record that none of them assert any claim of outright ownership of the safe. Rather, any "property interest" (Claimants' Mem. Opp'n Mot. Summ. J., DE # 36, at 5) that they may have obtained[8] in the safe at the time of MacDonald's death was at best temporary pending the appointment of an administrator to the estate. See N.C. Gen. Stat. § 28A-15-2(a) ("Subsequent to the death of the decedent and prior to the appointment and qualification of the personal representative or collector, the title and the right of possession of personal property of the decedent is vested in the decedent's heirs; but upon the appointment and qualification of the personal representative or collector, the heirs shall be divested of such title and right of possession which shall be vested in the personal representative or collector relating back to the time of the decedent's death for purposes of administering the estate of the decedent."); cf. Wright v. Smith, 564 S.E.2d 613, 615 (N.C. Ct. App. 2002) ("[T]he title to . . .

_____

[8] Although Pedersen-MacDonald and Johansen perfunctorily state that they are MacDonald's heirs, they have not presented any evidence or made any specific allegations regarding the issue of whether MacDonald had a will or whether he died intestate. As a result, they have not demonstrated their entitlement to MacDonald's personal property, and their attempt to rely on the common-law trespassory theory articulated in Jones necessarily fails.

real property does not automatically vest with the personal administrator upon the administrator's appointment in the same manner that title to personal property vests <u>automatically</u> with the administrator." (emphasis added)), <u>disc. review denied</u>, 579 S.E.2d 106 (N.C. 2003). The court cannot say, based on the facts of this case, that suppression of the evidence obtained from the search of the safe would further the objectives of the Fourth Amendment, particularly where claimants had no idea that the safe even existed at the time of the search. Claimants have failed to demonstrate a sufficiently close connection to the safe for the purposes of establishing standing.

The court also emphasizes that although claimants seek suppression of the evidence derived from an allegedly unconstitutional search of the locked safe, they point to no Fourth Amendment violation that is personal to them. They argue that Jakeway was unable to consent to search of the safe because she did not have a key, but it is also clear that none of the claimants had a key to the safe at the time the search was conducted. Rather, it is implicit in claimants' argument that MacDonald locked the safe, MacDonald possessed the key, and MacDonald was the one who had Fourth Amendment rights in the safe and its contents. Thus, claimants are attempting to vicariously assert the Fourth Amendment rights of another – MacDonald – something that the Supreme Court's jurisprudence does not allow. <u>See</u> <u>United States v. Salvucci</u>, 448 U.S. 83, 86 (1980); <u>Rakas</u>, 439 U.S. at 133-34; <u>$1,790,021 in U.S. Currency</u>, 261 F. Supp. 2d at 315. This is made evident by the fact that in all of the cases cited by claimants in support of their theory of an unreasonable search, the individual who raised the Fourth Amendment challenge was the person who was the target of the search, <i>i.e.</i>, the person who possessed and placed a lock on the item in question, and not a third party, such as claimants. <u>See</u>

Trulock v. Freeh, 275 F.3d 391, 402-03 (4th Cir. 2001); United States v. Kinney, 953 F.2d 863, 865-66 (4th Cir. 1992); United States v. Block, 590 F.2d 535, 537-41 (4th Cir. 1978); United States v. Foster, 654 F. Supp. 2d 389, 394-95 (E.D.N.C. 2009).

Accordingly, the court finds that claimants lack standing to challenge the search of the safe found at the apartment. Furthermore, claimants' argument that the information obtained from the searches of the Audi and Lalone's residence should be suppressed rests completely on the assumption that the search of the safe was unconstitutional. (See Claimants' Mem. Opp'n Mot. Summ. J., DE # 36, at 8-9.) As a result, there are no grounds to suppress any of the evidence found during the searches of the safe, the Audi, or Lalone's residence, and this evidence may be considered by the court in ruling on the government's motion for summary judgment.

B.      Government's Motion for Summary Judgment

Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment should be granted only in those cases "in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law." Haavistola v. Cmty. Fire Co. of Rising Sun, Inc., 6 F.3d 211, 214 (4th Cir. 1993). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the court is required to draw all

reasonable inferences in favor of the non-moving party and to view the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255. The moving party has the burden to show an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The party opposing summary judgment must then demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. Anderson, 477 U.S. at 248. A mere scintilla of evidence supporting the case is insufficient. Id. at 252. "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Teamsters Joint Council No. 83 v. Centra, Inc., 947 F.2d 115, 119 (4th Cir. 1991).

The Civil Asset Forfeiture Act of 2000 governs, among other things, the forfeiture of assets "used to commit or facilitate the commission of a criminal offense . . . ." 18 U.S.C. § 983(c)(3). Here, the government seeks forfeiture under 21 U.S.C. § 881(a)(6), which subjects to forfeiture all proceeds traceable to illegal drug transactions. In such cases, the burden of proof is on the government to establish, by a preponderance of the evidence, that (1) the property is subject to forfeiture, and (2) there was a substantial connection between the property and the offense. 18 U.S.C. § 983(c)(1), (3); see United States v. Herder, 594 F.3d 352, 364 (4th Cir. 2010); United States v. $94,200.00 in U.S. Currency, Civ. No. 1:11CV00609, 2012 WL 2885129, at *5 (M.D.N.C. July 13, 2012); United States v. $50,720.00 in U.S. Currency, 589 F. Supp. 2d 582, 583 (E.D.N.C. 2008).

"The government may rely on circumstantial evidence to establish forfeitability," Herder, 594 F.3d at 364, but the court will look to "the totality of the circumstances to determine whether the [g]overnment has met its burden," United States v. $864,400.00 in U.S. Currency, No.

13

1:05CV919, 2009 WL 2171249, at *2 (M.D.N.C. July 20, 2009), aff'd, 405 F. App'x 717 (4th

Cir. 2010) (per curiam) (unpublished). It is not necessary that the government trace the currency

to a specific drug transaction. See, e.g., United States v. $10,700.00 in U.S. Currency, 258 F.3d

215, 225 (3d Cir. 2001); United States v. $61,200.00 in U.S. Currency, 805 F. Supp. 2d 682, 687

(S.D. Iowa 2010). If the government satisfies its evidentiary burden, "the burden then shifts to

the claimant to establish by a preponderance of the evidence that the Defendant property is not

subject to forfeiture." United States v. .30 Acre Tract of Land, 425 F. Supp. 2d 704, 709

(M.D.N.C. 2006); see also $864,400.00 in U.S. Currency, 2009 WL 2171249, at *4.

Here, the court finds that the government has met its burden of showing by a

preponderance of the evidence that the defendant currency is subject to forfeiture under 21

U.S.C. § 881(a)(6) and that there was a substantial connection between the currency and the

offense. The government's evidence supports the conclusion that the currency seized was the

proceeds of illegal drug transactions. MacDonald had a history of involvement with illegal

drugs. Jakeway stated that she and MacDonald both used cocaine on a regular basis, and

MacDonald died from cocaine toxicity. (J.D. Williams Decl., DE # 29-3, ¶¶ 9, 21.) Drug

paraphernalia and the remnants of controlled substances were also found throughout the

apartment. (Id. ¶ 12; W. Baxley Decl., DE # 29-4, ¶ 7.)

The circumstances surrounding the discovery of the currency further confirm its

connection to illegal drugs. First, MacDonald's wallet, containing $2,599.00, was located in a

safe that also contained twenty-five grams of cocaine. (J.D. Williams Decl., DE # 29-3, ¶¶ 15-

16; S.W. Holbrook Decl., DE # 29-6, ¶¶ 14-15.) In addition, two narcotics detector dogs alerted

to the presence of the odor of controlled substances in the trunk area of the Audi driven by

MacDonald.  (E. Savitts Decl., DE # 29-2, at 6; W. Baxley Decl., DE # 29-4, ¶ 14; A.

Morrissette Decl., DE # 29-7, ¶¶ 8, 28; C.H. Carey Decl., DE # 29-8, ¶¶ 13-14.)  The suitcase

found in the trunk contained $691,814.00.  (E. Savitts Decl., DE # 29-2, at 7; A. Morrissette

Decl., DE # 29-7, ¶ 34; C.H. Carey Decl., DE # 29-8, ¶ 15.)  See United States v. Funds in

Amount of $30,670.00, 403 F.3d 448, 459 (7th Cir. 2005) ("[I]t is likely that trained cocaine

detection dogs will alert to currency only if it has been exposed to large amounts of illicit

cocaine within the very recent past."); $50,720.00 in U.S. Currency, 589 F. Supp. 2d at 583-84

(granting summary judgment in favor of the government in a civil forfeiture case in which a

large amount of currency was found in a suitcase in the trunk of a car and a drug dog alerted to

the suitcase and the trunk).  The currency within the suitcase was vacuum sealed and wrapped in

a manner that provides strong evidence of a connection to drug activity.  (E. Savitts Decl., DE #

29-2, at 6-7; A. Morrissette Decl., DE # 29-7, ¶ 32; C.H. Carey Decl., DE # 29-8, ¶ 15.)  See

United States v. $84,615 in U.S. Currency, 379 F.3d 496, 501-02 (8th Cir. 2004) (finding

substantial connection to drug activity where currency was packed in vacuum-sealed bags);

United States v. $99,990.00 in U.S. Currency, 69 F. App'x 757, 763 (6th Cir. 2003) (per curiam)

(unpublished) (finding that currency was packaged in a manner indicative of drug activity where

it was heat sealed and wrapped in tape); United States v. $49,790 in U.S. Currency, 763 F. Supp.

2d 1160, 1168 (N.D. Cal. 2010) (finding substantial connection to illegal drug trafficking where

currency was packed in vacuum-sealed bags).

Moreover, the search of MacDonald's room in Lalone's residence revealed controlled

substances as well as various tools of the drug trade, including a ledger and digital scale.  (E.

Savitts Decl., DE # 29-2, at 8-9; A. Morrissette Decl., DE # 29-7, ¶¶ 20, 24.)  See United States

15

v. Ray, 367 F. App'x 478, 481 (4th Cir. 2010) (classifying a digital scale with cocaine residue as a tool of the drug trade). The search of Lalone's garage and outdoor garbage container also revealed unused and used vacuum sealer bags, some of which had markings indicating large denominations of currency (e.g., "12K"). (E. Savitts Decl., DE # 29-2, at 9; A. Morrissette Decl., DE # 29-7, ¶¶ 25-26.) Some of the used vacuum sealer bags contained fabric softener sheets, which are used to conceal the odor of controlled substances and bulk currency contaminated with the odor of controlled substances. (Id.) See United States v. $129,727.00 U.S. Currency, 129 F.3d 486, 491 (9th Cir. 1997) ("Courts have often recognized the strong connection between fabric softener sheets and illegal drugs. . . . The nexus between fabric softener and drug trafficking is recognized to be of great probative value.").

The sheer quantity of currency seized also indicates that it is tied to drug transactions. See, e.g., $61,200.00 in U.S. Currency, 805 F. Supp. 2d at 688 ("A large amount of cash is strong evidence connecting the money to illegal drug activities." (citation and internal quotation marks omitted)). This conclusion is bolstered by the fact that the government has shown that MacDonald had no legitimate source of income that would explain the large amount of currency seized in this case. (E. Savitts Decl., DE # 29-2, at 9-10; A. Morrissette Decl., DE # 29-7, ¶¶ 41-48, 57-61; K. Pedersen-MacDonald's Resp. First Req. Admis., DE # 31-1, ¶¶ 1-5; L. Johansen's Resp. First Req. Admis., DE # 31-2, ¶¶ 1-5; R. Lalone Dep., DE # 30-1, at 30:4-31:2; 66:6-67:9.) See United States v. Currency, U.S., $147,900.00, 450 F. App'x 261, 264 (4th Cir. 2011) (per curiam) (unpublished) ("[E]vidence of legitimate income that is insufficient to explain the large amount of property seized satisfies the preponderance of the evidence standard[]." (citation and internal quotation marks omitted)); United States v. $4,266.75 in U.S. Currency, No.

1:07cv00565, 2008 WL 5234346, at *4 (M.D.N.C. Dec. 12, 2008).

Based on all of the above, the court finds that the government has demonstrated, by a preponderance of the evidence, that the defendant currency is subject to forfeiture as proceeds traceable to illegal drug transactions. Because claimants have not specifically denied the government's evidence, nor provided any of their own, they have failed to establish any facts sufficient to create an issue for trial. See, e.g., United States v. $10,000.00 in U.S. Currency, 348 F. Supp. 2d 612, 617 (M.D.N.C. 2004) (finding that claimant's general denials of government's pleadings were insufficient to survive summary judgment where the claimant provided no evidence to establish a legitimate source for the seized funds or to explain why the currency was stored in a locked safe with illegal drugs).

C.    Independent Evidence Supporting Summary Judgment

Furthermore, the court finds that even if claimants did have standing to object to the search of the safe, and that search was determined to be unreasonable, the government would still be entitled to summary judgment. If property is seized illegally – for example, as a result of an unlawful search – the illegal seizure "does not immunize that property from forfeiture as long as the government can sustain the forfeiture claim with independent evidence." United States v. Martin, 662 F.3d 301, 306 (4th Cir. 2011); see also United States v. $291,828.00 in U.S. Currency, 536 F.3d 1234, 1237 (11th Cir. 2008) (per curiam) ("[E]ven if evidence is subject to suppression, the government may obtain forfeiture based on other independent evidence."). The independent source doctrine "allows admission of evidence that is actually found by legal means through sources unrelated to the search." United States v. $493,850.00 in U.S. Currency, 518 F.3d 1159, 1165 (9th Cir. 2008) (citation and internal quotation marks omitted); see also Nix v.

Williams, 467 U.S. 431, 443 (1984) ("The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation."); United States v. Jefferson, 571 F. Supp. 2d 696, 701 (E.D. Va. 2008) ("[E]vidence obtained by independent, legitimate means may be admitted if the government establishes that the legitimate discovery of the evidence was not the result of information obtained by means of the original, illegal search."). This doctrine ensures that the government is not put in a worse position than it would have been in had there been no police misconduct. See Nix, 467 U.S. at 443; Jefferson, 571 F. Supp. 2d at 701.

Initially, the court notes that even if the search of the safe was constitutionally unreasonable, the existence and identity of the defendant currency is not suppressible:

> [W]hen the illegally seized *res* in a civil forfeiture proceeding consists of currency, courts may consider the fact that the illegally seized *res* is currency. . . . While courts may not introduce illegally seized currency into evidence or consider its amount, courts may recognize that illegally seized property consists of currency, if that is the case.

$493,850.00 in U.S. Currency, 518 F.3d at 1166; see also INS v. Lopez-Mendoza, 468 U.S. 1032, 1039-40 (1984) (citing circuit court cases in support of the proposition that the identity of the *res* is not suppressible in a forfeiture proceeding, even if there was an unlawful search and seizure).

In addition, the government argues that it has produced other evidence that was obtained from sources independent of the search of the safe. During the course of the investigation following MacDonald's death, officers with the NHCSO learned that there was an outstanding warrant in California charging MacDonald with attempted murder. (E. Savitts Decl., DE # 29-2, at 10-11.) The attempted murder charge was related to the loss of approximately sixty-five

18

kilograms of cocaine in September 2010 by relatives of the intended victims. (Id.) MacDonald

was reportedly responsible for the cocaine. (Id.) Both the Torrence, California Police

Department and the Redondo Beach, California Police Department "revealed that MacDonald

was a prolific trafficker of both marijuana and cocaine in their jurisdictions." (Id. at 11.) Two of

MacDonald's associates in California have also provided details regarding MacDonald's drug-

trafficking activities in California. (N. Sanders Decl., DE # 31-4; C. Sanders Decl., DE # 31-5.)

　　　　Claimants contend that all of the information obtained from the California investigation

is not independent evidence. They maintain that this evidence should be suppressed as fruit of

the poisonous tree because if the safe had not been searched illegally, the NHCSO would not

have had any use for the California information and would have closed MacDonald's case as a

death by drug overdose. (See Claimants' Mem. Opp'n Mot. Summ. J., DE # 36, at 5, 10.)

　　　　Even if claimants' argument were true, "[e]vidence should only be excluded if the

illegality is at least a but-for cause of obtaining the evidence." United States v. McManaman,

673 F.3d 841, 849 (8th Cir.) (citation and internal quotation marks omitted), cert. denied, 133 S.

Ct. 647 (2012); see also Hudson v. Michigan, 547 U.S. 586, 592 (2006); Segura v. United States,

468 U.S. 796, 815 (1984). In this case, MacDonald's fingerprints were taken at the apartment

during the officers' initial investigation and prior to the search of the safe. (S.W. Holbrook

Decl., DE # 29-6, ¶¶ 10-14.) Pursuant to NHCSO standard operating procedures, his fingerprints

would have been submitted to the Federal Bureau of Investigation and the North Carolina State

Bureau of Investigation for an identity check. (Id. ¶ 20.) Through this process, information

regarding MacDonald's criminal background, including the outstanding warrant for his arrest,

would also have been obtained. (Id.) Because the California information would have been

discovered even if the safe had not been searched, the search was not a but-for cause of obtaining the evidence.[9]  Accordingly, the California information has an origin that is independent of the search of the safe and, therefore, it is admissible as evidence of MacDonald's involvement in drug trafficking.[10]

Furthermore, prior to the search of the safe, MacDonald was found lying on his back on the bedroom floor, with blood coming out of his nose and white residue around his lips.  (J.D. Williams Decl., DE # 29-3, ¶ 7; W. Baxley Decl., DE # 29-4, ¶ 6.)  A search of the apartment conducted with Jakeway's consent revealed five cellular phones in the kitchen; a rolled up $5 bill containing white powder residue; a straw and flyer in the kitchen containing white powder residue; suspicious white powder on a cutting board in the kitchen; two glass smoking pipes; and confirmed cocaine residue on the master bathroom counter top.  (J.D. Williams Decl., DE # 29-3, ¶ 12; W. Baxley Decl., DE # 29-4, ¶ 7.)  During the initial investigation, Jakeway also informed the officers that she and MacDonald used cocaine two or three times a day and that they had snorted some cocaine at approximately 8:00 a.m the previous morning.  (J.D. Williams Decl., DE # 29-3, ¶ 9.)

More importantly, Jakeway told officers prior to the search of the safe that MacDonald carried a couple thousand dollars in his wallet.  (E. Savitts Decl., DE # 29-2, at 4-5; J.D. Williams Decl., DE # 29-3, ¶¶ 10, 14; S.W. Holbrook Decl., DE # 29-6, ¶ 13.)  Considering the

---

[9] The court notes that claimants do not dispute that the routine fingerprinting of MacDonald would have brought the outstanding California warrant to the attention of the NHCSO.  (See Claimants' Mem. Opp'n Mot. Summ. J., DE # 36, at 10.)

[10] Even assuming but-for cause, the link between the search of the safe and the California information is too attenuated to invoke the exclusionary rule.  For example, the willingness of MacDonald's associates in California to provide affidavit testimony in this case is a factor that "represents a significant attenuation of the link between the police misconduct and its evidentiary fruits."  United States v. Gray, 491 F.3d 138, 155 (4th Cir. 2007) (citation and internal quotation marks omitted).

substantial evidence that has been presented in this case to show that MacDonald had absolutely no legitimate source of income, see discussion, supra, at 16-17, this statement by Jakeway demonstrates that MacDonald continued in the drug trade after he moved from California to North Carolina. Thus, even if the amount of the currency and the evidence found during the searches of the safe, the Audi, and Lalone's residence were excluded on Fourth Amendment grounds, the government's independent evidence is sufficient to establish, by a preponderance of the evidence, that the defendant currency is subject to forfeiture under 21 U.S.C. § 881(a)(6) and that there was a substantial connection between the currency and the offense.

### III. CONCLUSION

The court has considered all of the parties' arguments, the record of this matter, and the relevant legal precedent, and has concluded that there is no genuine dispute of material fact to be resolved. Accordingly, the government's motion for summary judgment (DE # 28) is GRANTED. The defendant currency is forfeited to the government, and the government is directed to dispose of said currency according to law. The Clerk is directed to enter judgment in favor of the government and close the case.

This 25 April 2013.

_____

W. Earl Britt
Senior U.S. District Judge